UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

K.S., on behalf of herself and her child, D.S.,          :

                                    Plaintiffs,          :

                                                         :

          -against-                                      :

                                                         :

NEW YORK CITY DEPARTMENT OF EDUCATION, THE          :
BOARD OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK, CHANCELLOR          :
DAVID C. BANKS, IN HIS OFFICIAL CAPACITY, and THE
CITY OF NEW YORK,                                        :

                                    Defendants.          :

———————————————————————— x

Civ. No. 24-cv-03390 (JSR)

FIRST AMENDED COMPLAINT

AND JURY DEMAND

## PRELIMINARY STATEMENT

1.      This is an action brought by K.S. on behalf of herself and her child D.S.
("Plaintiffs")  alleging that Defendants, the New York City Department of Education ("DOE"),
The Board of Education in the City School District in the City of New York ("BOE" or the "School
District"), and Chancellor David C. Banks, in his Official Capacity ("Chancellor") (collectively
"Defendants") violated Plaintiff's rights under the Individuals with Disabilities Education
Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et seq*., Section 504 of the Rehabilitation Act,
29 U.S.C. § 701 ("Section 504"), 42 U.S.C. § 1983 ("Section 1983"), as well as provisions of New
York State law.[1]

2.      Among other things, Defendants have  (a) denied Plaintiff D.S. a Free Appropriate

---

[1] Initials are used throughout this Complaint to preserve the confidentiality of sensitive medical,
educational, and disability-related information under the IDEA and the Family Educational
Rights and Privacy Act of 1974 ("FERPA"), and pursuant to Federal Rule of Civil Procedure 5.2.

Public Education ("FAPE") under the IDEA; (b) violated D.S.'s stay-put rights under 20 U.S.C. § 1415(j) of the IDEA: (c) failed to implement favorable orders of impartial hearing officers for proceedings held pursuant to the IDEA; (d) taken affirmative actions and failed to take affirmative actions which constitute systemic violations of the IDEA; (e) subjected D.S. to discrimination based on his disabilities; and (f) violated his rights under 42 U.S.C. § 1983.

3.     Defendants' failures are individual as to Plaintiffs as well as systemic as to Plaintiffs and to parents and students like Plaintiffs.

4.     Plaintiff K.S. has a pending federal court action, *K.S. et al. v. The City of New York, et al.,* 21-cv-4649 (JSR) ("K.S. 2021 Action"), against Defendants as well as the Administration for Children's Services ("ACS"), individuals in connection with their work for ACS, and private foster care agencies and individuals in connection with their work for the foster care agencies. In addition to education- and disability-related claims, that case also alleges a myriad of violations while D.S. was in the City's foster care system, including a failure to protect D.S. from physical and sexual abuse, multiple years of educational and medical neglect of D.S. and his needs, and inappropriate foster placements. Ultimately, Defendants in the pending K.S. 2021 Action concealed serious information about D.S. to induce K.S. to adopt him and then continued to withhold critical information about D.S.'s medical, educational, abuse and mental health needs and treatment after he was placed with K.S. which interfered with her ability to address D.S.'s varying needs.

5.     There is overlap with the K.S. 2021 Action in a variety of ways.

6.     The Court has consolidated both this action and the K.S. 2021 Action for pretrial purposes.

7.     Plaintiffs are requesting a jury trial for all issues that are triable to a jury.

JURISDICTION AND VENUE

8.    This Court has jurisdiction over Plaintiffs' federal claims under the IDEA pursuant to 20 U.S.C. § 1415(i)(3), 42 U.S.C. § 1988, and as an action raising a federal question under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4). The Court has supplemental jurisdiction to adjudicate any state claims arising out of the same facts as the asserted federal claims. 28 U.S.C. § 1367.

9.    Venue lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) as it is the judicial district in which Defendants are situated and/or reside.

PARTIES

10.    Plaintiff, K.S. and her son, D.S., are legal residents of Brooklyn, New York.

11.    D.S. is a "child with a disability" under the IDEA and an individual with a disability under Section 504 of the Rehabilitation Act.

12.    Defendant THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK ("BOE") was and continues to be the official body charged with the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York. N.Y. Educ. Law §§ 2590-b, -g.

13.    Upon information and belief, Defendant NEW YORK CITY DEPARTMENT OF EDUCATION ("DOE") is a creation of the BOE through its By-Laws.

14.    Upon information and belief, Defendant DOE is the official body charged with the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities. N.Y. Educ. Law § 2590-g

15.    Defendant Chancellor DAVID C. BANKS, in his Official Capacity, ("the

Chancellor"), is the current Chancellor of Defendants DOE and BOE and, as such, is entrusted with the specific powers and duties set forth in N.Y. Educ. Law § 2590-h.

16.     Defendant CITY OF NEW YORK ("City") is a municipal entity created and authorized under the laws of the State of New York.

17.     Upon information and belief, Defendant City exercises fiscal, administrative, and operational control over the other Defendants.

18.     Defendant City is responsible for funding special education services and implementing the relief requested pursuant to this action and in IDEA due process proceedings generally.

19.     The BOE, DOE, and Chancellor (collectively "Educational Defendants") jointly and/or individually constitute the Local Educational Agency ("LEA") under the IDEA and New York State law.

20.     The Educational Defendants are responsible for providing a FAPE to all eligible students in New York City and for promulgating policies and procedures in accordance with the IDEA and Section 504.

21.     All Defendants jointly and/or individually are recipients of federal financial assistance.

22.     When the "DOE" is referenced throughout, the term DOE refers individually to Defendant DOE, as well as collectively to the Educational Defendants.

<u>LEGAL FRAMEWORK</u>

**The IDEA**

23.     The IDEA is designed to "ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and

4

related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).

24.     States receiving federal financial assistance under the IDEA must adhere to the Act's procedural and substantive requirements and ensure that all eligible students with disabilities are afforded a FAPE. 20 U.S.C. § 1412(a).

25.     To be entitled to a FAPE, a student must have one or more of thirteen disabling conditions and, by reason of the disability, require special education and related services. 34 C.F.R. § 300.8(a)(1); *see also* 8 N.Y.C.R.R. § 200.1(zz).

26.     A FAPE must meet each student's "unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *see also* 8 N.Y.C.R.R. §§ 200.1(qq), (ww), (fff).

27.     A FAPE must be provided in conformity with an Individualized Education Program ("IEP"). *See* 20 U.S.C. §§ 1401(9)(D), 1414(d)(2)(A); 8 N.Y.C.R.R. § 200.6(a)(2).

28.     Every student with designated disability classifications is entitled to an IEP, and the LEA must provide an IEP which is individually tailored to each student, and which sets forth the student's special education program and services. 20 U.S.C. § 1414(d); 8 N.Y.C.R.R. § 200.6(a)(2).

29.     "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas County Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017).

30.     School districts must have an IEP in place for each student with a disability at the beginning of each school year and must review that IEP not less than annually. 20 U.S.C. §§ 1414(d)(2)(A), (d)(4)(A)(i); *see also* 8 N.Y.C.R.R. § 200.4(f).

31.     The IDEA prescribes, in detail, the process for developing IEPs and their contents. 20 U.S.C. §§ 1414(d)(1), (d)(2); 34 C.F.R. §§ 300.320(a)-(b), 300.324; *see also* N.Y. Educ. Law §

4401, *et seq.*; 8 N.Y.C.R.R. § 200.4(d)(2).

32.    Before an initial IEP can be developed, a student must be evaluated in accordance with detailed procedures outlined in federal and state law. The IDEA mandates that school districts conduct a full and individualized initial evaluation of each student with a disability and reevaluate the student at least once every three years unless the parent and the school district agree otherwise. 20 U.S.C. §§ 1414(a)(1)(A), (a)(2)(B)(ii); *see also* 8 N.Y.C.R.R. §§ 200.4(b)(1)-(6).

33.    The school district must obtain informed consent from the parent before conducting the initial evaluation. 20 U.S.C. § 1414(a)(1)(D)(i)(I); 34 C.F.R. § 300.300(a)(1)(i).

34.    The initial evaluation must be conducted within 60 days of receiving parental consent unless extended upon mutual agreement of the parent and the school district's Committee on Special Education ("CSE"). 34 C.F.R. § 300.301(c)(1)(i); 8 N.Y.C.R.R. § 200.4(b)(1).

35.    Evaluations must be "sufficiently comprehensive to identify all of the child's special education and related service needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6). School districts must assess students "in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities." 34 C.F.R. § 300.304(c)(4).

36.    The school district must ensure that "assessments and other evaluation materials used to assess" a student "are selected and administered so as not to be discriminatory on a racial or cultural basis" and "are provided and administered in the language and form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is not feasible to so provide or administer." 20 U.S.C. § 1414(b)(3)(A)(i)-(ii); *see also* 8 N.Y.C.R.R. §§ 200.4(b)(6)(i)(a), (d).

37.    For a student with limited English proficiency, the CSE must "consider the language needs of the child as such needs relate to the child's IEP." 20 U.S.C. § 1414(d)(3)(B)(ii); *see also* 8 N.Y.C.R.R. § 200.4(d)(3)(ii).

38.    For a student whose behavior impedes his or her learning or that of others, a functional behavioral assessment ("FBA") must be conducted "as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities." 8 N.Y.C.R.R. § 200.4(b)(1)(v).

39.    For a student "whose behavior impedes the child's learning or that of others," the CSE must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i); *see also* 8 N.Y.C.R.R. §§ 200.4(a)(3)(i), 200.22(b)(2). "If a particular device or service, including an intervention, accommodation or other program modification is needed to address the student's behavior that impedes his or her learning or that of others, the IEP shall so indicate. A student's need for a behavioral intervention plan shall be documented on the IEP and such plan shall be reviewed at least annually . . . ." 8 N.Y.C.R.R. § 200.22(b)(2).

40.    New York State law provides that "[w]ithin 60 school days of the receipt of consent to evaluate for a student not previously identified as having a disability, or within 60 school days of the referral for review of the student with a disability, the board of education shall arrange for appropriate special programs and services." 8 N.Y.C.R.R. § 200.4(e)(1).

41.    The school district must ensure that "[a]s soon as possible following development of the IEP, special education and related services are made available to the child in accordance with the child's IEP." 34 C.F.R. § 300.323(c)(2). There must be "no delay in implementing" a student's IEP. 34 C.F.R. § 300.103(c).

**Private School Placements by the District**

42.     When, as here, a school district is unable to educate a child in a public school due to the student's individual needs, the IEP team can recommend that a student be placed in a private day school or private residential school.

43.     In New York City, when an IEP team thinks a student needs a private school program, the team must conduct certain assessments within six months of the placement, fill out certain paperwork and obtain approval of a supervisor of psychologists.

44.     Following these steps, the IEP team will then "defer" the student's IEP to Defendants' Central Based Support Team ("CBST"), a central office that is not part of this team.

45.     The CBST's job is to mail out the "packets" of information sent by the IEP team that include the student's IEP and whatever records the team used for the recommendation to the private schools that are approved by New York State Education Department ("NYSED").

46.     NYSED only approves schools to accept certain disability classifications.

47.     For residential placements, the CBST is not permitted to look outside of New York State for a placement until the CBST has exhausted options at all in-state schools, even if a student remains out of school and without services for months on end.

48.     If no in-state placement is identified, the CBST can start to look out of state, but only at certain out of state schools that NYSED has identified for this purpose.

49.     Upon information and belief, there are significant disparities in the types of students who are referred for private schools and particularly residential placements by the IEP team.

50.     In addition, many state-approved private programs are inexplicably segregated by race.

51.     Not all state-approved programs are comparable.  Many programs utilized by the

Defendants for purposes of placing students are programs that are usually used to educate Court-involved youth; ironically, most parents seeking residential placement through the Defendants are trying to avoid Court involvement.

52.    In addition, the state-approved programs are and remain grossly underfunded.

53.    Many of the state-approved programs are for children with autism or who have severe cognitive impairments.

54.    There are few programs for students who are not cognitively impaired or who have or are at high risk of foster care or juvenile court involvement.

**Defendants Do Not Have Programs and Services for Students with Chronic Conditions**

55.    Students with "Chronic Conditions" may have medical, psychological, behavioral and/or psychiatric origins.

56.    Psychiatric, psychological diagnoses and medical diagnoses that impact neurobiology and a child's behavior and actions are considered "Chronic Conditions" for the purposes of this complaint.

57.    Defendants fail, on a wholesale basis, to have appropriate programs, services, modifications, accommodations and supports for students with Chronic Conditions that interfere with their ability to regularly attend a public or private day school.

58.    Defendants only have one program for students who are unable to attend school regularly due to medical or psychiatric reasons.

59.    This program is called Home Instruction Schools ("HIS").

60.    Although the IDEA mandates that Defendants provide a FAPE to children with IEPs who require instruction in their homes, Defendants do not have adequate policies, procedures, resources and/or services to develop legally sufficient IEPs and placements for children with

chronic health conditions.

61.    The Defendants' HIS program fails to comply with the IDEA or Section 504 in several ways.

62.    Rather than affording the IEP team discretion to craft a FAPE that includes home-based services, Defendants' policies and procedures generally require parents to "apply" for HIS services when children are having chronic health conditions that impact on attendance.

63.    Under Defendants' policies, it is the parent's obligation to secure and provide documentation by a physician or a psychiatrist to be eligible for HIS services; the IEP team has no role.

64.    Defendants do not conduct diagnostic evaluations for children suspected of having neurodevelopmental disorders.

65.    Defendants do not conduct medical evaluations even though those evaluations are required by the IDEA.

66.    According to the Defendants' current website, requests for home instruction are "reviewed and then approved or denied by the Department of Health and Mental Hygiene (DOHMH)."

67.    Requests for home instruction are reviewed and either granted or denied by the Defendants' Office of School Health ("OSH").

68.    Unless a parent undertakes litigation, HIS services are set by policy.

69.    High school students are eligible for 10 hours per week of instruction, while elementary school students are eligible for five hours per week.

70.    Further, according to Defendants' website, high school students are only eligible to receive four credits per semester, provided they start services at the very beginning of the semester.

71.    A typical high school student pursues five credits per semester. IEP teams do not determine the frequency, duration, type, or location of HIS services.

72.    The Defendants do not offer part-time HIS services, regardless of circumstances.

73.    A student with a chronic health condition must either be able to attend school on a full-time basis or must be signed out of school to receive the one-size-fits-all HIS services.

74.    Defendants will not provide home-based services to children whose parents cannot afford to stay home or hire a chaperone in violation of the IDEA's mandate that a FAPE must be "free."

75.    If a parent cannot afford to stay at home or hire a chaperone, HIS services are only offered outside of the home, in a library or coffee shop.

76.    Further, HIS is not a comprehensive program and offers no mental health, behavioral health, psychiatric or psychological supports.

77.    HIS is a short-term temporary service available when a student is unable to attend school because of short-term disability or discipline.

78.    HIS provides purely academic services and does not offer and does not provide special education or related services, such as counseling, behavioral support or special education teacher support.

79.    HIS provides only general education and occasionally special education teachers to provide basic instruction.

80.    Most children referred for HIS are supposed to receive related services, but, upon information and belief, they do not receive them.

81.    Children who receive HIS do not receive any aspect of their IEP-mandated special education services.

82.     In September 2015, in another student's decision, the State Review Officer ruled that Defendants' home instruction policies and procedures violate the IDEA in that it is not implemented on an individualized basis through the IEP process.

83.     Defendants were aware of this decision but failed to modify their policies and procedures, which establishes Defendants' gross, reckless and intentional conduct.

84.     Further, Defendants do not offer any other aspect of non-academic services to children with Chronic Conditions with IEPs.

**Defendants Do Not Have Programs and Services for Students with IEPs who Have Chronic Conditions that Evidence Mental Health and Behavioral Needs Which Interfere with Their Ability to Engage with Education**

85.     The IDEA's menu of services includes counseling, psychological services, mental health services, behavioral interventions, social work services, parent training, family counseling, home-based services, and even services to help facilitate a child's attendance in school.

86.     The IDEA requires that districts have the resources and ability to meet the needs of children with Chronic Conditions, including those Chronic Conditions that cause mental health and behavioral needs which interfere with their ability to engage with education.

87.     The IDEA requires the provision of wrap-around, in-school and home-based behavioral therapy if that service is necessary to facilitate a student's ability to make functional or academic progress.

88.     The IDEA requires the provision of wrap-around, in-school and home-based counseling by a psychologist, social worker or other licensed mental health provider, if that service is necessary to facilitate a student's ability to make functional or academic progress.

89.     The IDEA requires the provision of intensive behavioral therapy if that service was necessary to facilitate a student's ability to make functional or academic progress.

90.    Defendants do not have adequate services or supports, such as those noted above, for students like D.S., with Chronic Conditions, that cause significant mental health needs and behavior.

91.    Further, many students like D.S. had to wait months for placement in a private day or residential school at some point in their educational careers.

92.    The Defendants do not have any services other than HIS or interim public-school placements that were grossly inappropriate to offer students while they are waiting for placement in residential settings.

93.    Most of the students who are waiting for day and residential placement due to psychological or psychiatric disabilities have significant behavioral and mental health needs that the DOE is failing to address while they wait for placement.

94.    Students with Chronic Conditions are either home or being provided wholly inadequate HIS services or forced to attend a totally inappropriate public-school setting.

95.    Further, IEP teams cannot consistently recommend a home-based program even for students who are waiting for placement for residential settings and cannot recommend wrap-around or home-based special education, related services, supplementary aids and services, modifications or supports.

96.    Further, even if home-based services were recommended, a working parent would have to quit his or her job to stay home as the Defendants refuse to provide any services in a child's home if the parent is not home.

97.    The Defendants do not offer or have any interim settings in a school building, or therapeutic setting for children who are waiting for residential placement.

98.    Rather, children with Chronic Conditions waiting on residential placement can

languish for months (or even years) without services, leaving the families to fend for themselves and leaving the children to regress.

**Due Process Procedures**

99.    The IDEA provides "procedural safeguards that enable parents and students to challenge the local educational agency's decisions." *Murphy v. Arlington Cent. Sch. Dist.*, 297 F.3d 195, 197 (2d Cir. 2002) (citing 20 U.S.C. § 1415).

100.    The IDEA permits parents to seek an independent educational evaluation ("IEE") if they disagree with the school district's evaluation. 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502; *see also* 8 N.Y.C.R.R. §§ 200.1(z), 200.5(g).

101.    If a parent "obtains an independent educational evaluation at public expense or shares with the public agency an evaluation obtained at private expense, the results of the evaluation . . . [m]ust be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child" and "[m]ay be presented by any party as evidence" in the context of a hearing conducted under the IDEA's due process procedures. 34 C.F.R. § 300.502(c); *see also* 8 N.Y.C.R.R. § 200.5(g)(1)(vi).

102.    Parents have the right to file a due process complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A).

103.    In New York, IDEA due process complaints must be litigated in a hearing conducted at the initial administrative level before an Impartial Hearing Officer ("IHO"). N.Y. Educ. Law § 4404(1); 8 N.Y.C.R.R. §§ 200.5(i)-(j).

104.    New York State law places the burden of proof in impartial hearings on school districts, "including the burden of persuasion and burden of production," "except that a parent    .

. . seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement." N.Y. Educ. Law § 4404(1)(c).

105.    During the pendency of IDEA due process proceedings, "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . . until all such proceedings have been completed." 20 U.S.C. § 1415(j).

106.    The decisions reached in impartial hearings are subject to administrative appeals to the State Review Officer ("SRO"), the second-tier administrative review under the IDEA. 34 C.F.R. § 300.514(b); N.Y. Educ. Law § 4404(2); 8 N.Y.C.R.R. § 200.5(k).

107.    An IHO decision that is not appealed is final and binding. *See* 34 C.F.R. § 300.514(a); 8 N.Y.C.C.R. § 200.5(j)(5)(v).

108.    An SRO decision that is not appealed is also final and binding.

109.    Any issue not appealed to the SRO, for which the SRO has jurisdiction, is deemed waived.

110.    Defendants are responsible for implementing final orders of hearing officers and of the SRO.

111.    Parents who prevail in a due process hearing may have the school district, here the Defendants, pay their reasonable attorneys' fees, costs, and expenses. 20 U.S.C. § 415(i)(3)(B)(i)(I).

112.    Defendants do not have policies and procedures in place to ensure full and timely implementation of hearing officer decisions, particularly where multiple school years are involved.

113.    Defendants do not have policies and procedures in place to ensure full and timely implementation of decisions issued by the SRO.

INDIVIDUAL FACTS

114.    D.S. spent much of his life in foster care, before being placed with K.S. as a foster child in 2017.

115.    In the spring of 2018, K.S. adopted D.S., who was then 11 years old.

116.    D.S. currently attends a residential treatment and educational center ("RTC") in Massachusetts pursuant to an IEP and placement offered by the DOE.

117.    K.S. had filed due process complaints pursuant to the IDEA for D.S. for several years for D.S. since she became his foster parent and then his adoptive parent.

118.    During the 2021-2022 school year. K.S. learned that he experienced seizures as a toddler, experienced a lack of oxygen at birth and has periventricular leukomalacia, and may have a genetic defect. She only learned about some of the abuse and medical conditions in the summer and fall of 2022, through documents produced by the City, his former foster care agency and the Child Advocacy Center ("CAC") in a federal lawsuit.

119.    D.S. engages in severely maladaptive behaviors when he becomes dysregulated, which occurs frequently and yet episodically. D.S.'s behaviors include aggression, property destruction, suicidal threats and ideations, throwing and playing with his feces, drinking his urine, disrobing, and sexually inappropriate behavior, as well as extremely aggressive verbal and physical behavior, tantrums, anger, and school refusal.

120.    D.S. currently is over six feet tall and requires individuals with physical stature and strength to keep him and others safe when he is having an episode.

121.    The DOE has denied D.S. a free appropriate public education ("FAPE") under the

16

IDEA and Section 504 *for a minimum of nine years in a row*, from the 2014-2015 school year ("SY") through the 2022-2023 SY.

122.    D.S. has had multiple mental health diagnoses, including post-traumatic stress disorder ("PTSD"), depression, attention deficit hyperactivity disorder ("ADHD"), and has been hospitalized numerous times since K.S. adopted him due to the severity of his behaviors, which posed dangers to himself and others.

123.    D.S.'s PTSD has been clinically determined to be a result of abuse, both physical and sexual, and neglect.

124.    K.S. has filed several impartial hearings for D.S.  since she became his foster parent and then his adoptive parent.

125.    K.S. initially filed three hearings, which were consolidated into Case No. 173308. Collectively these complaints alleged that K.S. was being denied D.S.'s educational records, while the other two collectively alleged that  D.S. had been denied a FAPE for several years, from 2014-2015, 2015-2016, 2016-2017,  2017-2018 and 2018-2019 school years.

126.    For the 2018-2019 school year, D.S. had attended a small, general education private school with support, that the DOE had funded as part of a prior impartial hearing decision.

127.    The DOE did not defend or assert that they provided a FAPE to D.S. for these years.

128.    On June 10, 2019, the hearing officer in Case No. 173308 awarded K.S. reimbursement and payment for D.S.'s tuition and some additional out-of-pocket costs as well as compensatory education for D.S. (the "2019 Decision").

129.    Unfortunately, after the 2018-2019 school year was over, and just prior to the 2019-2020 school year started, K.S. was advised that D.S. could not return to the private school due to behavioral issues he had at the very end of the 2018-2019 school year.

130.    Despite the above history, the DOE failed to develop any IEP and placement for D.S. for the 2019-2020 school year.

131.    Given that K.S. had no options for D.S. for the 2019-2020 school year from the DOE, as a result, she was forced to try to cobble together services using funding that she had from the 2019 Decision.

132.    The only program that accepted D.S. for 2019-2020 was Fusion Academy ("Fusion"), a 1:1 program that provided both 7th grade curriculum classes and remediation.

133.    K.S. arranged to use D.S.'s compensatory hours from the 2019 Decision starting on September 9, 2019.

134.    He received coursework in math, history, arts, ELA, science and music, as well as tutoring sessions.

135.    D.S. attended Fusion until May 11, 2020, was absent until May 26, briefly resumed services from May 27, 2020 until June 1, 2020 and did not attend thereafter.

136.    In addition to using the compensatory award in the 2019 Decision for Fusion, K.S. arranged for D.S. to receive instructional/tutoring services at Lindamood-Bell in 2019-2020.

137.    However, Lindamood-Bell ended up terminating D.S.'s services in spring of 2020, because there was an incident there where he threatened to harm himself. During the second half of the 2019-2020 school year, D.S. had an incident while at his Lindamood-Bell program during which he became dysregulated and threatened to hurt himself with a butter knife and the hot coffee pot he found in the staff kitchen. At that point, Lindamood-Bell discontinued D.S.'s services.

138.    The COVID-19 Coronavirus Pandemic ("Pandemic") shut down the schools, programs and most of the city in mid-March 2020.

139.    When Fusion Academy transitioned to remote learning due to the Pandemic in

March of 2020, D.S. experienced a significant regression. His online learning schedule had significant gaps of one or two hours between classes, with no instruction or supports, and those hours became very overwhelming for him. D.S. was not able to do his schoolwork independently and lost all his motivation to persist and work.

140.    Once all his schoolwork became virtual and it was his responsibility to work independently, he stopped trying. D.S. began actively refusing to do his schoolwork and would sign off in the middle of the class if he felt like it was becoming too challenging. Though he had been receiving As and Bs in his classes prior to the Pandemic, his grades dropped dramatically once remote learning began.

141.    The social isolation, fear of getting sick and/or losing his new family, coupled with the racial unrest during that time, destabilized D.S. and led to a quick decline in his mental health.

142.    In addition, D.S. started to become addicted to technology and required constant monitoring to ensure that he was appropriately using the internet and refraining from risky behavior.  He began to access inappropriate websites and social media, and to develop various inappropriate and false on-line personas. D.S. also became non-compliant with remote learning and his family's directives.  D.S. initially wanted to play video games instead of doing his schoolwork, but then he discovered sexually inappropriate sites and online chat rooms.

143.    At this point, the effects of the sexual abuse and trauma he experienced as a child began surfacing in the way he was engaging in this online community. Until that point, D.S. had never previously exhibited any sexually inappropriate behavior while living with K.S.

144.    D.S.'s inappropriate online activity led to tense exchanges with K.S. and her partner and frequent meltdowns where he would become dysregulated and throw and break things. D.S. would lose his self-controls in ways that made the home unsafe, and he began articulating suicidal

thoughts and threatening to commit suicide. These volatile behaviors resulted in a series of hospitalizations for D.S., including an overnight psychiatric evaluation.

145.    K.S. first took him to Bellevue in March of 2020 for a one-to-two-night stay after he wrote a suicide note. He was then released and diagnosed with depression.

146.    Though K.S. reduced her work hours in an attempt to spend more time assisting D.S. with remote learning, he continued to "spiral" and would lock himself in his bedroom for periods of time. When K.S. locked up his technology in a closet to prevent him from accessing inappropriate sites, he got up during the night to break into the closet to access his computer.

147.    At this time, K.S. began seeking out a new therapist and psychiatrist to try to address D.S.'s escalating behaviors and decompensating psychological state. D.S. tried a few different programs, but nothing helped, and D.S. returned to the E.R. at Park Slope, Columbia Presbyterian about a month later after threatening to commit suicide again. D.S. was transferred to an adolescent psychiatric facility in White Plains, where he stayed for stabilization. D.S. demonstrated highly concerning behaviors during his stay, such as defecating in his sink, but was nonetheless discharged after just two weeks.

148.    After D.S. was sent home, he almost immediately "re-spiraled" out of control. He smashed K.S.'s computer, threw furniture, and threatened to hurt K.S. and himself with a knife. D.S. returned to the facility in White Plains for three weeks, where he continued to exhibit concerning behaviors, including inappropriate acts of urination and defecation. He also threw a chair at one of the doctors.

149.    At this point, K.S. began looking into residential treatment programs for D.S. funded by insurance due to the extremity of the dysregulated behaviors he was exhibiting. After D.S. had spent three weeks in the White Plains facility, K.S. was notified that there was an open

bed for him at KidsPeace in Pennsylvania. K.S. was unable to find any programs located closer to home, as most residential programs in New York were closed to new admissions due to the Pandemic. As a result, K.S. brought D.S. to KidsPeace in July of 2020.

150.    In the summer of 2020, K.S.'s insurance company funded D.S.'s enrollment at what was supposed to be a short-term therapeutic treatment program at KidsPeace, which was the only placement available.

151.    During the Spring of 2020, K.S. engaged in conversations with personnel at Explore Middle School, a public charter school that had originally accepted D.S. for the 2020-2021 school year,  regarding D.S.'s need for an IEP. When K.S.  did not hear anything from the DOE, in July, K.S. sent a letter to the CSE Chairperson responsible for District 18 requesting guidance on getting an IEP and placement for the 2020-2021 school year.

152.    On August 4, 2020, a psychologist from CSE 6 emailed K.S. to conduct a social history. K.S. spoke with the psychologist for an updated social history, but the DOE did not offer to conduct any additional assessments for D.S.

153.    The DOE eventually held an IEP meeting on August 28, 2020 via telephone, and an IEP was created. K.S. indicated that one of the district representatives that participated in the meeting was frequently interrupted with personal phone calls and seemed very distracted, which was unsettling. K.S. expressed concern about the disruptions that were occurring, as well as concern that the DOE had only completed a social history update prior to the IEP meeting. The IEP team was primarily operating based on the outdated information in the previous IEP that had been created several years prior while D.S. was at NYCC during the 2017-2018 school year.

154.    Until a placement was found, the DOE merely offered to provide one to two hours of remote academic support in the home each day, even though K.S. clearly indicated that D.S.

had already received this type of remote instruction during his time at Fusion and had severely

deteriorated and regressed. Further, the IEP indicated that D.S. did not need a behavior intervention

plan, despite the fact that he was in a residential program for significant behavioral needs at the

time of the IEP meeting. The IEP also made the woefully insufficient recommendation for thirty

minutes of counseling for D.S., once a week.

155.    K.S. testified that she was concerned that D.S. would not receive appropriate

supports if he was discharged from KidsPeace and would be unsafe in her home.

156.    As alleged further, when the DOE determines that a student cannot be educated in

the DOE's public schools, the DOE "defers" the child's IEP to the DOE's Central Based Support

Team ("CBST") an office charged with looking for New York State-approved programs.

157.    After the August 2020 IEP meeting, the DOE "deferred" D.S.'s IEP to the CBST;

the CBST assigned a "case manager" to search for residential schools.

158.    However, the DOE did not locate a program that was willing to take D.S.

159.    Following the August 2020 IEP meeting, K.S. received phone calls from four New

York State-approved residential programs indicating that they had received referral packets from

the DOE and wanted to discuss enrollment. Though K.S. followed up with the representatives from

these programs, none of them offered D.S. a seat.

160.    The DOE has elected not to operate any residential programs itself and or to

contract directly with other residential programs. Instead, the DOE has elected to rely upon

contract providers for residential settings that are approved by the New York State Education

Department ("NYSED") so that the DOE can obtain reimbursement for those placements.

161.    On or about August 25, 2020, K.S. filed a due process complaint ("DPC"), one of

many she has had to file, concerning Defendants' failure to provide D.S. a free appropriate public

education ("FAPE") for the 2019-2020 and 2020-2021 school years.

162.    Defendant DOE assigned the DPC an Impartial Hearing Case No. 197100.

163.    Ultimately, K.S. withdrew her claims for 2019-2020 without prejudice in Case No. 197100, as D.S. was experiencing an emergency situation during the 2020-2021 school year and there was insufficient time to litigate both years and address the emergency.

164.    D.S. remained at KidsPeace funded by K.S.'s insurance for much of the 2020-2021 school year.

165.    However, D.S.'s behavior and academic functioning had continued to decline in 2020-2021. He continued to engage in the behaviors that required him to enroll in the residential treatment center in the first place, such as threating to self-harm, expressing suicidal intent, and acting outwardly aggressive. Further, D.S. began exhibiting concerning behaviors K.S. had never seen before, such as defecating on the floor, making sexually inappropriate comments, and acting in sexually inappropriate ways. When D.S. becomes dysregulated, would take off his clothes and run around naked or exposed himself to staff when he is very angry.

166.    D.S.'s academics severely declined as well.  Additionally, while at school, D.S. was engaging in attention seeking behaviors such as threatening the teacher's aide, exposing himself to her, and acting as if he is masturbating under the table. As a result of these behaviors, D.S. has been spending much of his days in the crisis room at school and is completing very little to no homework or schoolwork.

167.    Additionally, the environment and rules that are in place at KidsPeace  negatively affected D.S.'s behaviors. For example, D.S. was kept indoors one hundred percent of the time, as he was currently on watch as an elopement risk due to his tendency to push on the doors to set of their alarms.

168.    D.S. was not permitted to wear his shoes and was forced to wear his shower shoes on the fifteen-minute walk to and from the school building, even when there was snow on the ground.

169.    K.S. was also very concerned about D.S.'s safety, as the staff at KidsPeace were ill-equipped to handle his behaviors. In fact, the staff had threatened to call the police at times due to the sexualized component of D.S.'s behaviors, despite the fact that these are the behaviors his treatment plan at KidsPeace should have been addressing.

170.    Notably, while K.S. never observed these behaviors before, as noted above, it seems that New York City and the DOE were on notice of these behaviors based on several documents that were produced through litigation.

171.    As a result of D.S.'s severely declining behaviors, K.S. was working to try to place him in an alternative residential program that can provide a deeper focus on the sexual abuse component of the trauma he experienced and help him develop normal behaviors that will be safe and acceptable when he comes home.

172.    K.S. had contacted programs that were previously suggested by the DOE, as well as programs covered by her insurance, but none of the programs would accept D.S. due to the sexualized component of his outwardly aggressive behaviors. Further, as noted above, the DOE was unable to locate a program.

173.    K.S. had also advised the DOE that the KidsPeace placement was not working. However, the DOE had no options to offer her, other than to remove D.S. and place him back at home without any clinical or therapeutic support.

174.    As a last resort, K.S. eventually contacted Jodi Liston, an educational consultant seeking assistance with locating an appropriate residential program for D.S. K.S. had to pay a fee

of $5000.00 for Ms. Liston's consultation services.

175.    Ms. Liston suggested Kaizen Academy ("Kaizen"), as a program specifically for youth with sexual trauma. Ms. Liston indicated that she had previously placed clients there who had a great deal of success. Jodi Liston has visited Kaizen, but she has never been paid directly by Kaizen to refer students. Though K.S. testified that Ms. Liston recommended three other programs for D.S. in addition to Kaizen, no other programs besides Kaizen have indicated that they would accept him.

176.    After K.S. testified at the hearing, K.S. moved D.S. to Kaizen as of March 30, 2021, as her insurance company indicated that it would agree to fund the program for at least the first ten days.

177.    On or about March 30, 2021, K.S. moved D.S. to Kaizen Academy in Utah, another residential treatment center.

178.    Kaizen charged $500.00 per day. There is additionally an enrollment fee of $1500.00. For private-pay families, Kaizen requires a monthly payment schedule consisting of payment on the first of the month for 30 days. For school districts, Kaizen sends out monthly billing at the end of the month to be paid within the first fifteen days of the next month. Kaizen must receive payment within 30 days of services being rendered due to Kaizen being a small, 16-bed facility. This requirement is the same whether parents are paying Kaizen privately or a school district is paying directly. In circumstances where a district pays the school directly, Kaizen has "single-case agreements" that are negotiated with the district or the state. If the parent has a contract with Kaizen, a single-case agreement is not necessary.

179.    At the end of March 2021, K.S. enrolled D.S. in Kaizen.

180.    K.S. eventually obtained funding for Kaizen through her insurance by way of a

single-case -agreement.  However, at the time that K.S. filed her hearing in 2020, she was not sure whether the insurance would cover the entire cost.

181.    To transition D.S. from KidsPeace to Kaizen, K.S.  used a transfer company called Assisted Interventions, as it is unsafe for K.S. to transport D.S. on her own. Assisted Interventions employs trained and qualified individuals that are in the business of transporting children safely between residential programs, and two individuals from the company picked D.S. up at KidsPeace and flew with him to Utah to meet with the Kaizen admissions team at the airport there. The total cost for the Assisted Interventions program to transport D.S. was $6,483.94.

182.    In a Findings of Fact and Decision dated May 2, 2021, the IHO in Case No. 197100 issued a decision ("2021 Decision"), finding *inter alia* that the DOE denied D.S. a FAPE for the 2020-2021 school year and awarded various relief including, *inter alia*, ordering the DOE to pay tuition and cost of related services for D.S.' program at Kaizen (less any part of what insurance covered) as of March 30, 2021.

183.    In the 2021 Decision, the IHO also ordered *inter alia* the following:

a.    The DOE reimburse K.S. for all of D.S.'s transportation costs to Kaizen from Kids Peace, including all costs from Assisted Interventions and airfare;

b.    The DOE reimburse K.S. for transportation costs to/from Kaizen for home visits, as well as the final transportation costs from Kaizen to home or another placement;

c.    The DOE reimburse K.S. for all costs associated with five round trip visits to Kaizen for K.S. and her partner to visit D.S., including transportation, lodging and meals;

d.    The DOE reimburse K.S. up to $5,000 for the services of an educational consultant who helped locate and facilitate placement;

e.    The DOE fund a compensatory bank for any day during the 2020-2021 school year that the DOE did not fund tuition at a residential placement, including any time that was funded by K.S.'s insurance; and

      f.     The DOE must reimburse K.S. or pay Kaizen directly within 30 days of receipts and invoices.

184.    Neither party appealed the 2021 Decision.

185.    The DOE failed to implement the 2021 Decision by *inter alia* failing to reimburse K.S. fully and timely, despite repeated requests and submissions of documents.

186.    For example, K.S. submitted invoices in relation to 3 round-trip visits to Kaizen. Upon information and belief, the DOE incorrectly limited the reimbursement to visits during the 2020-2021 school year, which was not a restriction written in the 2021 Decision. At this time, K.S. has been denied her full reimbursements pursuant to the 2021 Decision.

187.    Similarly, upon information and belief, the DOE has erroneously limited the reimbursement for D.S.'s transportation costs to only those incurred during the 2020-2021 school year, despite the fact that this time restriction was not indicated in the 2021 Decision.

188.    After the placement at Kaizen was made, in April 2021, the DOE held an IEP meeting for the 2021-2022 school year. Again, the DOE's 2021 IEP team recommended a residential placement. However, despite feedback from Kaizen and reports from KidsPeace and K.S. about D.S.'s need for intensive therapeutic, behavioral, and academic interventions, the DOE recommended only an 8:1:1 ratio with two sessions per week of counseling. The structure of the recommended program with only two sessions of counseling and no behavioral support or interventions targeted to D.S.'s disabilities and psychological conditions was wholly inappropriate. The DOE then recommended a District 75 program as an interim placement, since the DOE had no residential placement to offer. In May 2021, the hearing officer in Case No. 197100 issued a final decision awarding tuition at Kaizen, as well as funding for compensatory education in the event D.S. did not remain at Kaizen or the DOE did not fund Kaizen for any part of the 2020-2021 school year.

189.    Although D.S. was making progress in Kaizen, he continued to display troubling behavior, and engaged in inappropriate behavior, which lead to a behavioral crisis and yet another hospitalization. During the time that D.S. attended Kaizen, the DOE did not fund it because K.S.'s insurance covered the tuition. Unfortunately, D.S. was expelled from Kaizen in September 2021. He was transferred to a hospital in Utah. The Parent was told that if she did not find a placement, D.S. would be discharged.

190.    On September 28, 2021, the Parent wrote to the DOE seeking an emergency placement based on the above situation. However, the DOE was unable to locate a placement. In early October 2021, the Utah hospital discharged D.S. back to the Parent.

191.    K.S. used the Assisted Interventions transportation group to transport D.S. from the hospital back to New York City on October 12, 2021.

192.    When D.S. returned to New York, the DOE's only option for D.S. was to place him back in District 75. However, D.S. was unable to function in a day-based school setting and the program was inappropriate. K.S. had to use some of D.S.'s compensatory education to hire a full-time 1:1 behavior therapist to remain in the home with D.S. when he was not in school.

193.    Within a few weeks, D.S. had another dangerous episode and had to be hospitalized in New York.

194.    The DOE's CBST referred schools for K.S. to investigate, both in and out-of-state, but none of the schools would accept D.S. K.S. also employed consultants to try to find schools. Between the DOE and K.S., applications for D.S.'s residential placement were made to scores of schools, with no success.

195.    Eventually, the consultants identified one residential program that would accept D.S.: the Stetson School in Massachusetts. The Parent arranged for the DOE to fund the Stetson

School directly as of December 2021, out of D.S.'s compensatory bank of hours, until such time as alternative funding from the DOE can be arranged or agreed upon via pendency.

196.    K.S. transferred D.S to the Stetson School as of December 2021. K.S. used the Assisted Interventions transportation group to transport D.S. to Stetson on December 14, 2021. The DOE never clarified whether and to what extent the DOE started to fund Stetson via pendency in this action or if the DOE used the compensatory hours. K.S. testified that the DOE has not fully paid the tuition at the Stetson School.

197.    D.S.'s behavior and functioning at Stetson was variable. In some ways, he made progress, and has started to share and disclose more about his traumatic upbringing and the abuse he experienced. However, D.S. has also experienced very problematic behavioral episodes, where he continues to remove his clothes, publicly defecate, urinate, engage in smearing and Coprophagia and make suicidal ideations.

198.    On May 20, 2022, the DOE held an IEP meeting and thereafter on May 24, 2022, issued an IEP (the "2022 IEP"). The final recommendation for D.S. was a residential placement in a New York State approved residential program. Further, once again, the DOE recommended that D.S. should leave Stetson and enroll in an interim District 75 program in an 8:1:1 classroom at 75K753:P.S. K753 - School for Career Development. This school and program were inappropriate for D.S., as it did not provide adequate support.

199.    In September 2022, a staff member at Stetson had D.S. arrested for feces throwing, behavior that everyone agreed was a manifestation of D.S.'s significant disabilities.

200.    D.S. was unable to return to Stetson and was initially placed in juvenile detention. However, after further incidents, was placed in a highly secure lockdown facility for approximately four months with other children who had committed serious crimes, including murder.

201.    D.S. did not receive any education and/or treatment in the juvenile detention facility.

202.    The only reason D.S. was in the situation to be arrested was due to the lack of FAPE by the DOE and the lack of responsibility that the DOE took relative to D.S.'s education.

203.    When a parent lives in New York City, the DOE remains responsible for the education of a child even if that child is in an out-of-state residential placement.

204.    The DOE never contacted the juvenile detention center or made any effort to work with the school district in Massachusetts to provide a FAPE to D.S., even though under the IDEA, D.S. was entitled to a FAPE while he was in juvenile detention and the DOE remained responsible for that FAPE during that time.

205.    The juvenile court judge in Massachusetts had advised D.S.'s court appointed attorney in that proceeding that if an alternative placement for D.S. was not identified, he would have to remand D.S. to juvenile detention until the age of 18.

206.    The DOE was aware of this situation but was unable to take the steps to try to secure a placement or an appropriate interim placement for D.S. and took no steps to try to intervene in the situation in Massachusetts, even though the only reason D.S. was in the position he was in was because the DOE had not arranged for a placement.

207.    K.S. had by then retained another consultant who had identified the only program willing to accept D.S. called the J. Flowers Health Institute ("Flowers"), which was a short-term treatment program.

208.    The prior decision for the 2020-2021 school year had provided that if the student's then-program, Kaizen, was unavailable, the DOE would have to fund an alternative residential program. K.S. required clarification as to whether Flowers would be consistent with that order, as

Flowers would not agree to accept D.S. without a guarantee of funding for the program.

209.    An interim hearing was held to address the issue. Flowers had testified that Flowers is not generally intended to serve as a long-term setting; it has the goal of stabilizing and developing plans for adolescents like D.S., with the goal that he could transition to a less restrictive setting. K.S. testified that if a program is not identified, D.S. would be remanded to juvenile placement until the age of 18. Among other things, at the hearing held to address the issue of funding Flowers, the DOE "did not object to the emergency request to place the student at Flowers" nor to "the parents' request for an order placing the student at Flowers."

210.    On January 5, 2023, the IHO issued an interim order ("IO") concerning flowers ("IO"). Among other things, that IO directed DOE Defendants to fund D.S.'s placement at a short-term treatment program called the J. Flowers Health Institute ("Flowers").

211.    In the IO, the IHO ordered the DOE to "immediately fund the student's placement at Flowers as pendency, until the student is stabilized and is able to gain admission to another appropriate residential setting." The payment was to be made no later than January 12, 2023, and ongoing payments for D.S.'s placement at Flowers made at least 15 business days prior to the last day on which the prior period's payment will expire. The IHO also directed the DOE to reimburse the cost of transporting D.S. to Flowers. Further, the IHO directed the DOE to continue to fund Flowers or another appropriate private residential placement until all issues raised in the pending due process complaint before the IHO are resolved by final order.

212.    The DOE then refused to comply with the IO, necessitating K.S. to file and obtain a TRO and preliminary injunction in federal court.

213.    On January 26, 2023, in the 2021 K.S. Action,  Judge Crotty issued an order directing the DOE to comply with the IO. *K.S. o.b.o. D.S. v. City of New York, et al.*, 21-cv-4649

(PAC), ECF. No. 77.

214.    On February 2, 2023, D.S. was released from detention and was enrolled in Flowers. After D.S. transitioned to Flowers, K.S. continued to pursue her search for placements with a consultant and asked the DOE to continue to do so.

215.    K.S. used the Assisted Interventions transportation group to transport D.S. to Flowers. This cost K.S. $4,698.70.

216.    While K.S was relatively stable at Flowers for approximately two months, in early April 2023, D.S. had a few violent and destructive episodes and was twice hospitalized at the Houston Behavioral Healthcare Hospital ("HBHH"). At Flowers, D.S. engaged in thousands of dollars' worth of property destruction and threatened a fire, as well as suicide. Flowers has charged K.S. with the cost of damages that D.S. has done to the lodging provided by D.S.

217.    After the second transfer to HBHH on April 6, 2023, due to the severity of his behaviors, Flowers determined that D.S. needed a more restrictive level of care. Even with two full-time 1:1 male aides at Flowers, Flowers did not feel that they could continue to safely keep him. At HBHC, the psychiatrist determined that he would modify D.S.'s medication in the hope that this might facilitate a reduction in severe behaviors, which are episodic.

218.    According to K.S., D.S. stayed at HBHH for approximately two months from the beginning of April until May 18, 2023. D.S. was initially admitted to the hospital due to his need to be psychiatrically stabilized, however continued to stay at the hospital as there was no alternative placement for him. D.S. received schooling three days per week during his stay at HBHH. Further, two therapists from Flowers visited D.S. four or five times per week in while he was at HBHH, providing therapy.

219.    K.S.'s insurance paid for the first few weeks of D.S.'s hospital stay, but then

stopped paying in May. As such, K.S. had to pay a private rate totaling $18,000 for the month of May. K.S. tried to appeal her insurance's refusal to pay for hospital services, but so far has been unsuccessful.

220.    Because D.S. could not remain at HBHH, and the DOE did not have any alternative option at that time, K.S. was, again, left to her own to find a program. Using her consultant, she identified the Family First Educational Services ("FFES") program, a residential program located in Florida and the program agreed to admit D.S. FFES claimed it could address D.S.'s behaviors and represented that it had the means to do so. Having no other options, K.S. asked the DOE to fund FFAS.

221.    Although FFES was a residential program, the DOE, again, refused to fund it under pendency, necessitating yet another TRO and preliminary injunction in federal court; the Court issued an order directing funding for FFES. *K.S. o.b.o. D.S. v. City of New York, et al.*, 21-cv-4649 (PAC), ECF. Nos. 95-106.

222.    On May 18, 2023, K.S. contacted the Assisted Interventions transportation group to transport D.S. down to Florida. This cost K.S. approximately $6,000, due to D.S.'s need to be supervised during transport by two staff members. D.S. was enrolled in FFES as of May 18, 2023 for a 90-day stabilization program. However, on D.S.'s third day there, he became dysregulated, disrobed, and threw feces at staff and other students.

223.    Shortly thereafter, K.S. received a call from FFES indicating that D.S. could no longer stay there as they were not equipped to meet his needs. Specifically, FFES advised that D.S.'s safety and that of other students was "too compromised" to allow him to remain, and he was abruptly discharged on May 23, 2023. K.S. now owes $15,200 for the time D.D. spent at FFES.

224.    With no other options, K.S. used the Assisted Interventions transportation group and had D.S. flown back to New York, where she then sought admission to Bellevue Hospital's adolescent psychiatric emergency room. This Assisted Interventions trip cost K.S. another $6,000. Bellevue admitted D.S. to their long-term adolescent psychiatric unit for stabilization and supervision. D.S. received some education while at Bellevue.

225.    Finally, on or around the end of June 2023 or early July 2023, the CBST was able to secure a seat for D.S. in the Judge Rotenberg Center ("JRC"), a treatment program and residential school focused on youth and adult behavior in Massachusetts.

226.    K.S. spoke with JRC regarding various concerns regarding D.S.'s placement there, including D.S.'s former incarceration in Massachusetts, given the law in that state which allows residential staff to call the police on residential treatment residents for behavior that constitutes a manifestation of their disabilities.

227.    At the underlying hearing, D.L., the CBST supervisor admitted that she was unaware of the fact that D.S. had been arrested for throwing his feces at Stetson, and it was outside of her authority to implement a restriction on JRC that they could not call the police on D.S. for conduct that was a manifestation of his disability. D.L.'s only explanation for why JRC might be appropriate for D.S. was that it was "an approved New York State Education School."

228.    D.L. could not explain why the CBST was recommending a placement that did not align with D.S.'s IEP.

229.    K.S. had (and has) various concerns she had with JRC, including its past use of electroshock therapy and other extreme interventions for wrong behaviors, the lack of parent input into D.S.'s treatment program, medications, and curriculum, limited call time, location away from home, and lack of family therapy.

34

230.    JRC also informed K.S. of other students who exhibited extreme behaviors such as feces throwing, kicking, and property damage, however advised K.S. that they do not normally call the police on students.

231.    Despite K.S.'s concerns, as the DOE provided no other options for residential placement, and Bellevue was threatening to discharge D.S., she was forced to agree to placement at JRC.

232.    Since placing D.S. at JRC, K.S. has learned that JRC is socially promoting D.S., awarding him grades and high school credits even though he is not completing the requisite work.

233.    JRC also restricts D.S.'s access to her and her husband and does not permit regular contact.

234.    In addition, D.S. is almost eighteen years old and, in theory, could sign himself out of JRC next year.

235.    JRC has advised K.S. that some students may remain at JRC after they turn twenty-two, provided there is funding through the Office of Persons with Developmental Disabilities ("OPWDD").

236.    However, D.S. had been deemed ineligible for OPWDD services in the past.

237.    Notably, throughout most of this time period, K.S. was denied access to critical information and documentation that she needed to try to address D.S.'s needs.

238.    K.S. finally obtained documentation concerning some of the events that occurred prior to the time she agreed to serve as D.S.'s foster parent through the K.S. 2021 Action.

239.    Among other things, in or around the fall of 2022, K.S. was provided records confirming that the DOE had concealed from her that D.S.'s long-term foster parents had indicated physical abuse complaints regarding the foster kids and D.S. The City also disclosed documents

indicating that D.S. had Periventricular leukomalacia, as well as a history of seizures as a toddler and a possible genetic developmental delay.

240.    It was not until December 2022, that K.S. was provided records indicating that D.S. had been raped by another foster child just prior to the time he came to live with her.

**The Residential IEP and CBST Procedures Were Infirm**

241.    When students like D.S. require residential services, the DOE's Committee on Special Education ("CSE") recommends "residential placement" with an arbitrary classroom ratio and does not describe and/or prescribe any particular special education services, supplementary aides and services, research-based interventions or any individualized features that a child required.

242.    Further, the CSE IEP teams are not permitted to recommend any 1:1 instructional services, behavior supports, or any specific additional supports on an IEP unless a particular school already has those services in place.

243.    When the CSE is creating the IEP for a child such as D.S., the CSE has no information about the specific unique programs, or the therapeutic interventions or other supports that may or may not be available at the programs.

244.    Thus, the DOE creates only barebones IEPs for children who need residential placement with a somewhat arbitrary ratio and basic related services, with full knowledge that the IEP will need to be changed depending on which school accepts the child, as IEPs get changed to fit students into programs, depending on availability.

245.    At the impartial hearing held for Case No. 210063, the head of the CBST ("D.L.") and the CBST case manager ("D.A.") described a very dysfunctional process of how the CBST looks for placements for children (and for D.S. in particular), which was divorced from any

meaningful consideration of D.S.'s individual needs and the urgency of the situation.

246.    There is no meaningful coordination with the Committee on Special Education ("CSE") relative to the individual needs of children recommended for residential placement.

247.    Case managers from the CBST are restricted to looking for placements from a list of schools approved by the New York State Education Department ("NYSED") published on NYSED's website. While the CBST aims to place students within 60 days of receiving the deferral, there is no time limit on placing a student, nor are there specific procedures in place dictating when the CBST should begin looking at out of state programs. (emphasis added).

248.    However, the DOE is not legally restricted from electing to search for and place students like D.S. in schools that are not approved by NYSED.

249.    The only reason that the DOE restricts their search to state-approved programs is because those are the programs for which the DOE can obtain reimbursement from NYSED.

250.    D.L. testified that the CBST contacts schools approved for a student's disability classification, despite the fact that all of the schools have different ratios, curricula and program designs.

251.    If a student is accepted at a particular program, even before the program has been finalized on the student's IEP, the CBST will stop looking for further alternative placements, but if a school that had been previously contacted responds with an opening, the CBST will let the parent know. In general, except in rare cases (10-20 per year), if the CBST finds a school, the IEP team will approve it.

252.    In the event that the CBST is having difficulty locating a program for a particular student, they have the ability to contact the head supervisor at NYSED, Amy McHugh, to determine whether there may be an appropriate program available, which D.L. has done on a few

occasions in the prior year for other children. D.L. testified that the CBST had not contacted NYSED regarding locating an appropriate placement for D.S. D.L. could not explain why she had not done this for D.S.'s case except that she had only recently been notified of D.S.'s situation and had not learned the whole history. D.L. opined in hindsight that D.S.'s case and the difficulties locating placement for him since 2020 should have necessitated NYSED's involvement. D.L. admitted she does not regularly meet with the CBST case managers and/or supervise their caseloads or receive a report of hard-to-place students. Further, D.L. did not appear to understand the meaning of LRE.

253.    Further, D.A., the case manager, did not appear to have the requisite qualifications, training or seniority to serve in this role.

254.    While D.A. received information from schools about their lack of capacity to meet D.S.'s needs, D.A. did not probe further to determine whether additional resources could have addressed the school's concerns. For example, she did not know the difference between physical restraints and electric shock therapy. Further, the testimony showed a breathtaking lack of coordination and communication between CBST and the CSE.

255.    After receiving D.S.'s case in 2020, D.A. applied to a number of residential placements in New York from the NYSED's list.[2] D.A. tried to look for programs with classroom ratios that matched D.S.'s IEP, but the search was not limited to schools that could satisfy the IEP mandates; D.A. testified that programs might have rejected D.S. based on a conflict in the ratio, but no one investigated the reasons why he was not admitted in 2020. In 2020, while D.S. was at

---

[2] Inexplicably, this list included public schools, such as Berkshire Union Free School District, which housed a school program for a juvenile detention center. There was zero explanation as to why any of these programs – including a detention school – would have been appropriate for D.S.

KidsPeace, Children's Home of Kingston was potentially interested in D.S. after reviewing the packet, but after speaking to K.S., the school rejected him. D.A. did not reapply to Kingston after the initial rejection in 2020. While D.S. was at KidsPeace, his case remained open, but no other placement could be found for the 2020-2021 school year.

256.    Inexplicably, CBST elected not to apply to any other programs for D.S. between May 2021 until June 2022, because D.A. was under the mistaken impression that D.S. was unilaterally placed. DOE elected not to explain this, even though the DOE was aware that D.S. was no longer at Kaizen as of September 2021, had returned to New York City, had enrolled in District 75, was transferred back to the hospital and only ended up in Stetson in December 2021, due to the lack of any other placement. Further, a hearing was pending at the time. The DOE proffered no adequate explanation as to why it stopped trying to locate placements for over one year, or why no out-of-state placements were explored.

257.    In June 2022, D.A. testified that she was notified (by someone) that D.S. was again in need of a placement, and submitted applications only to in-state schools, but D.S. was rejected due to a lack of openings. D.A. testified that the CBST sent these schools multiple applications for D.S. to ascertain whether a seat would eventually open up.

258.    In 2022, D.S.'s case was marked as "inactive" in the DOE's system, even though the DOE never sent applications to any out-of-state schools and D.S. still had no DOE placement.

259.    In November 2022, the Parent sent D.A. an email regarding D.S.'s incident at Stetson wherein he was arrested and placed in a juvenile detention facility. D.A. testified that she then submitted D.S.'s case for a "new referral," has D.S.'s case had been considered "inactive."

260.    The DOE did not notify K.S. of any of the above or introduce attempts to notify her about any change in D.S.'s status with CBST.

261.    Finally, in January 2023, *two- and one-half years after the initial CBST deferral*, the CBST applied to some out of state programs for D.S.  Originally, D.S. was rejected due to the lack of an opening. While JRC initially indicated they might be able to accommodate D.S. in six months, after D.S. was expelled from FFAS and was waiting for a placement in Bellevue, somehow JRC was able to find a seat for him, almost three years after the initial deferral.

262.    At the hearing in Case No. 210063, the DOE did not assert that it proffered a FAPE to D.S. and, despite bearing the burden of proof under N.Y. Education Law § 4404, the DOE argued that K.S. was not entitled to any relief, and D.S. was not entitled to any compensatory education.

263.    At the hearing, K.S. requested that the hearing officer issue an order directing the following relief:

a.  The DOE denied D.S. a FAPE for the 2019-2020, 2020-2021, 2021-2022 school years.

b.  The DOE violated Section 504.

c.  The relief and findings of the IO issued on January 5, 2023 are incorporated herein by reference into the final order unless otherwise modified by the final order. It is critical that the IHO include the IO in her final order, as the DOE asserts that once a final order is issued, an IO is no longer in place and cannot form the basis of any stay-put rights in the future.

d.  The record establishes that for the 2021-2022 and 2022-2023 school years, D.S. required an appropriate, intensive, therapeutic residential treatment program with 24-hour, 1:1 and, at times, 2:1 support with transportation to and from the program, which included (a) at least five round-trip visits by the parents per school

year, which were funded by the DOE's reimbursement to the parents for travel, lodging and meals; (b) funding and/or reimbursement to the parents for any ancillary expenses related to the placements; and (c) Reimbursement to the parents for transportation for D.S. for home visits or if he has to be transported to another setting and the DOE is unable to implement transportation.

e. The DOE must reimburse K.S. for the following travel costs incurred by K.S. with Assisted Interventions during the SYs at Issue:

    i. Primary Children's Hospital in Utah to K.S.'s home in October 2021: $4,778.64.[3]

    ii. NY Presbyterian to Stetson in December 2021: $2,727.94.[4]

    iii. DYS Lehy Center to J. Flowers in February 2023: $4,698.70.[5]

    iv. HBHH in Texas to FFES in May 2023: $5,699.54.

    v. FFES to New York City (Bellevue ER) in May 2023: $5,214.10.[6]

f. The DOE should make all outstanding payments to Stetson for the time that D.S. attended there and/or to satisfy any debt that K.S. owed, as well as for any excused absences for which K.S. is financially liable for July, August and October 2022, which K.S. testified amounted to $59,778.54. In addition, if K.S. ends up paying any tuition directly, the DOE should reimburse her.

g. The DOE should reimburse K.S. for the costs of Placement Consulting Services with Gabriela Deambrosio Consulting, totaling $6,000.00.

---

[3] It is not clear whether the DOE would agree that this was covered by pendency prior to the IHO's IO.
[4] It is not clear whether the DOE would agree that this was covered by pendency prior to the IHO's IO.
[5] This is clearly outlined in the IHO, which K.S. asks to be incorporated into the final order as it has not been paid.
[6] K.S. asserts that the (d) and (e) should also be covered by the IO, but it to the extent that they are not, she asks for them to be reimbursed.

h. To the extent K.S. owes an enforceable debt to Fusion with respect to any days that D.S. was absent prior to the time the contract was legally terminated because of his hospitalization, the DOE should reimburse K.S. and/or directly fund the remaining amount owed to Fusion as equitable relief. K.S. would not have incurred this debt or expense had the DOE offered an IEP or placement or FAPE to D.S. in 2019-2020. If K.S. ends up paying any of the costs of Fusion, directly, to address the absent days, the DOE should reimburse her. K.S. testified that the outstanding amount is $17,000. This is an injury K.S. suffered that should be compensable under the IDEA or Section 504 if the IHO were to find that the remedy is not available under the IDEA.

i. The DOE should reimburse K.S. for $8,015.54 for the costs of damages D.S. caused to Flowers for which K.S. was already charged. K.S. would not have incurred this debt or expense had the DOE offered an IEP or placement or FAPE to D.S. in 2022-2023. This is an injury K.S. suffered that should be compensable under the IDEA or Section 504, in the event that the IHO concluded that this debt would not be part of the overall costs of placement of D.S. in Fusion. K.S. was unaware at the time she requested payment for Flowers that this would be a cost that she had to incur, as the damages only happened once D.S. was attending there. Thus, she only requested the tuition at the time of the pendency hearing.

j. The DOE should reimburse K.S. for the charges incurred by D.S.'s stay at HBHH in Texas after insurance funding ended and the DOE did not have any program for D.S. up to the cost of $15,200 in the event K.S.'s insurance does not cover the costs following an appeal or she is not reimbursed by HBHH for any amounts she

paid.

k.  The DOE should reimburse K.S. and her husband, Matthew, for lodging, travel and meals for any visits that K.S. and/or her husband made to any residential program and/or hospital in which D.S. was placed during the 2021-2022 and 2022-2023 school years.

l.  In addition to the above, for the 2019-2020 school year (calculated on a 365-day basis) the DOE will calculate a bank of compensatory days and hours, with the minimum number of days being 365 (the period from July 1, 2019 to June 30, 2021) during which time D.S. should have been placed in an appropriate therapeutic residential setting.  For each of those days, K.S. may elect one of the following compensatory remedies from the bank:

m.  The DOE should, upon the parent's request, create a compensatory bank of 5 hours per day of 1:1 compensatory education for each of the days the DOE did not fund residence in 2019-2020, which K.S. can use for 1:1 instruction, remediation/tutoring, behavior therapy, transition services, executive functioning support, counseling, parent counseling and/or training, and/or counseling and transportation at prevailing market rates paid by the DOE's Impartial Hearing Implementation Unit.

n.  Further, the compensatory hours should be able to be converted to tuition and/or funding for a school, program, therapeutic, and/or hospital program at K.S.'s election.

o.  In the event K.S. elects the conversion rate, the DOE should fund the conversion by assigning rates consistent with the prevailing market-rates for 1:1 instruction,

psychological services and transportation approved and/or paid by the DOE's Impartial Hearing Implementation Unit for instruction or counseling services.

p.  K.S. can seek reimbursement, direct payment or satisfaction of any debt she has with respect to the compensatory services and/or conversion.

q.  In addition to the above, for the 2021-2022 school year (calculated on a 365 day basis) the DOE will calculate a bank of compensatory days and hours, with the minimum amount of days being 365 (the period from July 1, 2021 to June 30, 2022) during which time D.S. should have been placed in an appropriate therapeutic residential setting, less any day that the DOE funded a residential placement for D.S., the tuition of which did not get deducted from a compensatory bank awarded in a prior case.   For each of those days, K.S. may elect one of the following compensatory remedies from the bank:

r.  The DOE should, upon the parent's request, create a compensatory bank of 5 hours per day of 1:1 compensatory education for each of the days the DOE did not fund residence in 2021-2022, which K.S. can use for 1:1 instruction, remediation/tutoring, behavior therapy, transition services, executive functioning support, counseling, parent counseling and/or training, and/or counseling and transportation at prevailing market rates paid by the DOE's Impartial Hearing Implementation Unit.

s.  Further, the compensatory hours should be able to be converted to tuition and/or funding for a school, program, therapeutic, and/or hospital program at K.S.'s election.

t.  In the event K.S. elects the conversion rate, the DOE should fund the conversion

by assigning rates consistent with the prevailing market-rates for 1:1 instruction, psychological services and transportation approved and/or paid by the DOE's Impartial Hearing Implementation Unit for instruction or counseling services.

u. K.S. can seek reimbursement, direct payment or satisfaction of any debt she has with respect to the compensatory services and/or conversion.

v. In addition to the above, for the 2022-2023 school year (calculated on a 365 day basis) the DOE will calculate a bank of compensatory days and hours, with the minimum amount of days being 365 (the period from July 1, 2022 to June 30, 2023) during which time D.S. should have been placed in an appropriate therapeutic residential setting, less any day that the DOE funded D.S.'s attendance in (a) Stetson (the tuition of which did not get deducted from a compensatory bank awarded in a prior case); (b) Flowers; (c) FFES; or (d) a hospital. Further, regardless of whether the DOE funds Stetson for any day D.S. was in juvenile detention, he should receive compensatory education for any day he spent in juvenile detention. For each of those days as set forth herein, K.S. may elect one of the following compensatory remedies from the bank:

w. The DOE should, upon the parent's request, create a compensatory bank of 5 hours per day of 1:1 compensatory education for each of the days the DOE did not fund residence in 2022-2023, which K.S. can use for 1:1 instruction, remediation/tutoring, behavior therapy, transition services, executive functioning support, counseling, parent counseling and/or training, and/or counseling and transportation, at prevailing market rates paid by the DOE's Impartial Hearing Implementation Unit.

x. Further, the compensatory hours should be able to be converted to tuition and/or funding for a school, program, therapeutic, and/or hospital program at K.S.'s election.

y. In the event K.S. elects the conversion rate, the DOE should fund the conversion by assigning rates consistent with the prevailing market-rates for 1:1 instruction, psychological services and transportation approved and/or paid by the DOE's Impartial Hearing Implementation Unit for instruction or counseling services.

z. K.S. can seek reimbursement, direct payment or satisfaction of any debt she has with respect to the compensatory services and/or conversion.

aa. K.S. may select a combination of remedies under the paragraphs awarding compensatory education.

bb. Counseling herein is defined as counseling with any licensed mental health provider in any state, including a psychologist, psychiatrist, psychotherapist, social worker or mental health counselor.

cc. Where the decision refers to funding with respect to any compensatory education awarded, that term includes (a) reimbursement to K.S. and/or her husband; (b) satisfaction of K.S.'s debt and/or (c) direct payment to a provider or entity.

264.    On February 9, 2023, the IHO in Case No. 210063 issued a decision mainly in K.S.'s favor, awarding various relief (the "2023 Decision").

265.    The IHO in the 2023 Decision ruled as follows:

a. The DOE  denied D.S. a FAPE for the 2019-2020, 2021-2022 and 2022-2023 school years;

b. The DOE should reimburse K.S. for all travel costs incurred with Assisted

Interventions (the private agency) for the school years at issue;

c. The DOE should directly fund and/or reimburse K.S. all outstanding payments to Stetson while D.S. was enrolled at Stetson;

d. The DOE must reimburse K.S. for the costs of education placement consulting services in the amount of $6,000;

e. The DOE must directly fund and/or reimburse K.S. all outstanding payments to Fusion during the 2019-2020 school year;

f. To the extent not already reimbursed through the IO, the DOE was ordered to reimburse the parent for lodging, travel and meal expenses incurred by K.S. and her husband for any visits they made to D.S.'s residential programs during the 2021-2022 and 2022-2023 school years;

g. The January 5, 2023 IO "is incorporated herein in as much as the DOE shall fund all outstanding fees and costs as described and associated with Flowers and the parents' round-trip visits to visit D.S. that were incurred" while pendency rights under 20 U.S.C. §1415(j) were in place.

266. The IHO denied all other requests for relief.

267. Both parties cross-appealed aspects of the 2023 Decision to the New York State Review Officer.

268. The SRO issued a decision, designated SRO No. 24-099.

269. The SRO partially reversed the IHO's denial of compensatory education and awarded 480 hours of 1:1 instruction for certain periods during which D.S. was in New York City and not provided a FAPE, as well as a return to D.S. of the compensatory educational hours that she had to use for Fusion for the 2019-2020 school year.

270.    The SRO incorrectly denied the additional compensatory education sought by K.S.

271.    The SRO did not award D.S. the compensatory education hours that K.S. had to use for Lindamood-Bell or to make up for any time from March 2020 and onward that D.S. did not have a FAPE for the remainder of the 2019-2020 school year.

272.    Further, the SRO denied compensatory education for the time D.S. spent in Juvenile Detention, for behavior that was a manifestation of his disabilities.

273.    Had D.S. been properly placed in a residential setting in New York and in accordance with the Least Restrictive Environment mandate of the IDEA, he would not have been in a position to be arrested for behavior that was a manifestation of his disability, and which behavior was one of the reasons that he required residential treatment.

274.    The SRO failed to take jurisdiction of K.S.'s Section 504 claims, because the SRO does not have jurisdiction over Section 504.

275.    The SRO incorrectly reaffirmed the IHO's denial of reimbursement for damages caused by D.S. at Flowers (for which she was charged).

276.    Further, the SRO incorrectly ruled that the DOE would not be responsible for the full costs of D.S.'s stay at Flowers – including damages – asserting that under this circumstances, the district was not obligated to bear the full cost of D.S.'s residential stay.

277.    The SRO also denied compensatory education and/or any relief for the period of time D.S. had been expelled from Flowers and forced to remain in a hospital in Texas after he was no longer medically required to be hospitalized, as it was the DOE's failure to provide a FAPE that made it impossible for D.S. to return to New York.

278.    The SRO incorrectly found that there was no evidence in the record that D.S.'s hospital stay was not needed for medical reasons, when K.S. testified to that fact in the hearing.

279.    However, the SRO reaffirmed the IHO's award of reimbursement of the educational consultant retained by K.S. and denied the DOE's appeal.

280.    K.S. appeals all of the adverse findings and rulings of the IHO and the SRO.

281.    The IHO's adverse rulings in the 2023 Decision should be reversed and not afforded deference because, *inter alia*:

    a.  The IHO failed to take jurisdiction over all of the Section 504 and Section 1983 claims;

    b.  The IHO did not take jurisdiction over claims concerning policies and procedures;

    c.  The IHO made rulings that conflicted with the IDEA and the Court need not defer to the administrative officers on questions of law, such as whether D.S. was entitled to a FAPE while he was placed in juvenile detention and whether the DOE was responsible for the entire costs of D.S.'s residential placement at Flowers;

    d.  The IHO failed to address all of the claims raised in DPC;

    e.  The IHO ignored the evidence and also ignored the failure of the Defendants to submit evidence;

    f.  The aspects of the 2023 FOFD that denied relief were not well-reasoned;

    g.  The IHO shifted the burden of proof onto K.S.;

    h.  The IHO abused her discretion and failed to make D.S. whole for the deprivations he suffered;

    i.  The IHO misapplied the law; and

282.    The SRO's adverse rulings in the 2023 Decision should be reversed and not afforded deference because, *inter alia*:

    a.  The SRO made several findings of law in the SRO Decision that were not

supported by either statute or case law interpreting the IDEA;

b. The SRO failed to address the claims raised in DPC;

c. The SRO ignored the evidence and the failure of the Defendants to submit evidence;

d. The SRO made findings of fact that were not based on evidence in the record of the hearing;

e. The SRO prevented Plaintiffs from having sufficient space to plead claims in detail and then ignored claims validly raised;

f. The SRO failed to apply the law to the facts; and

g. The aspect of the SRO Decision which denied K.S. relief was not well-reasoned;

h. The SRO shifted the burden of proof onto K.S. and failed to fully hold Defendants to their burden of proof.

283.    No deference is due to the SRO because the SRO has an inherent conflict of interest and displayed bias and conduct inconsistent with a neutral factfinder.

284.    The SRO has an inherent, disqualifying conflict of interest that renders the SRO incapable of rendering an unbiased decision in cases raising systemic policy claims, as the SRO is a lawyer for the New York State Education Department ("NYSED") and an employee of NYSED.

285.    The SRO has a conflict of interest in this particular case, as the case raises question of systemic policies and practices that implicates the State in terms of liability.

**DEFENDANTS' CONDUCT CAUSED PLAINTIFFS HARM**

286.    Defendants' actions, inactions, policies procedures, and practices injured  D.S. irreparably.

287.    Defendants' actions, inactions, policies procedures, and practices injured  K.S. who

has rights under the IDEA and who is in the zone of interest of individuals that are protected under Section 504.

288.    While the administrative proceedings that gave rise to the 2021 Decision and the 2023 Decision were ongoing, the Defendants failed to timely implement D.S.'s stay-put rights under 20 U.S.C. §1415(j).

289.    Defendants failed to implement the interim and final orders issued by the hearing officers and the State Review Officer as set forth herein.

290.    K.S. has expended tens of thousands of dollars  on D.S.'s educational and therapeutic interventions during the years D.S. was denied a FAPE for which she should be reimbursed.

291.    K.S. has incurred debt for services that should be satisfied by the DOE.

292.    Although K.S. has won interim and final orders directing reimbursement, the DOE has not reimbursed most of these expenses.

293.    K.S. is entitled to the reimbursement already awarded, plus pre-judgment interest.

294.    As the prevailing party in IH Case No. 197100, IH Case No. 210063 and the SRO Case No. 24-099, K.S. is entitled to her reasonable attorneys' fees for all work performed in connection with those matters, as well as for the instant action.

295.    The fees and costs charged by Plaintiffs' counsel are consistent with and/or below market rates for the legal services performed, in light of counsels' experience and expertise and the complexity of the issues.

CLAIMS
FIRST CLAIM
SECTION 504 OF THE REHABILITATION ACT

296.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if

fully set forth herein.

297.    Defendants' conduct is knowing, intentional, reckless, and gross.

298.    The 2021 Decision explicitly found that the DOE violated Section 504 and that Plaintiffs were entitled to relief for the Section 504 violation.

299.    Defendants did not appeal the 2021 Decision.

300.    Defendants did not appeal the findings that the DOE denied D.S. a FAPE in the 2023 Decision.

301.    Defendants discriminated against D.S. under Section 504 by, *inter alia*, denying him reasonable accommodations, adopting systemic policies, procedures, and practices that violated his rights under the IDEA and engaging in widespread violations of the IDEA, including the failure to provide appropriate residential treatment for students with severe mental health issues.

302.    Furthermore, Defendants' discriminatory conduct and actions are the product of extensive, repeated, gross, and knowing violations of the IDEA and constitute bad faith and deliberate or reckless indifference to the students' federally protected rights.

303.    Defendants have acted with "bad faith or gross misjudgment."

SECOND CLAIM
IDEA

304.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

305.    Defendants denied D.S. a FAPE over a period of numerous years.

306.    Defendants failed to implement the due process provisions of the IDEA, and systemically failed to ensure that there are qualified staff available to implement the orders of the administrative hearing officers.

307.    Defendants did not timely and fully implement the relief in the favorable 2021 Decision, the 2023 Decision, the interim orders, and the SRO Decision, including reimbursement to K.S.

308.    Defendants failed to implement D.S.'s stay-put rights.

309.    Plaintiffs have exhausted the administrative procedures to the extent required by law.

310.    Defendants failed to adopt policies and procedures sufficient to ensure full and timely implementation of favorable decisions and stay-put services.

311.    Defendants failed to ensure that the DOE offered services that D.S. needed for a FAPE of his FAPE,  instead requiring parents like K.S. to try to find self-help remedies to plug the gaps in services.

312.    Defendants denied Plaintiffs their due process rights under the IDEA.

313.    Defendants' application of blanket policies and practices violates the IDEA.

314.    As the prevailing party, Plaintiffs should be awarded payment of reasonable legal fees for the work performed in connection with the proceedings described herein, including implementation D.S.'s pendency rights, of the 2021 Decision, the 2023 Decision, together with prejudgment interest, as well as for all work in connection with the instant federal action.

THIRD CLAIM
42 U.S.C. § 1983

315.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

316.    Defendants have violated 42 U.S.C. § 1983 by depriving Plaintiffs, under color of state law, of their rights, privileges, and immunities under federal statutory and constitutional law.

317.     By failing to implement the IOs, the 2021 Decision and 2023 Decision, Defendants violated 42 U.S.C. § 1983.

318.     By implementing, promulgating, and continuing to enforce and/or effectuate policies, practices, and customs as alleged herein, Defendants have denied Plaintiffs educational services to which they are entitled under the IDEA and New York law, in violation of 42 U.S.C. § 1983.

319.     By failing to supervise and train their employees and agents concerning due process and the laws and policies that protect Plaintiffs' rights under the IDEA and New York State Education law, Defendants have violated 42 U.S.C. § 1983.

320.     The Defendants violated Plaintiffs' rights under 42 U.S.C. § 1983 by failing to have adequate policies, procedures, protocols, and training to ensure that the provisions of the IDEA and Section 504 referenced herein were complied with, which deprived D.S. of his right to a free appropriate public education under federal and state law.

321.     Under color of state law, the Defendants deprived D.S. of his right to educational services afforded to her under the IDEA and New York State law, in violation of the Fourteenth Amendment of the U.S. Constitution.

322.     As a direct and proximate result of the Defendants' misconduct, Plaintiffs suffered and continue to suffer harm, which will continue unless Defendants are enjoined from their unlawful conduct.

<u>CONCLUSION</u>

WHEREFORE, Plaintiff respectfully requests that the Court:

i.      Assume jurisdiction over this action.

ii.     Issue a declaratory judgment on behalf of Plaintiffs that Defendants have

violated Plaintiffs' rights as alleged herein in violations of applicable federal and state laws.

iii.  Issue a permanent injunction directing Defendants to reimburse K.S. all of her outstanding costs and expenses required as part of 20 U.S.C. §1415(j), pursuant to interim and final hearing officer's orders, the SRO decision or otherwise that are still outstanding; and award equitable relief for the failure to implement the favorable 2021 Decision, and 2023 Decision.

iv.  Issue a permanent injunction directing Defendants to cease implementation of the policies and practices alleged herein that violate the IDEA and Section 504.

v.  Issue a final Order and Judgment in Plaintiffs' favor and award D.S. additional compensatory and equitable relief for the violations alleged herein for violations of his right to a FAPE, his stay-put rights under 20 U.S.C. §1415(j), and due to the deprivations of his educational services throughout the years at issue.

vi.  Award D.S. and K.S. damages;

vii.  Award Plaintiff K.S. reasonable attorneys' fees and costs in accordance with her status as the prevailing party in IH Case No. 197100, 210063 and SRO No. 24-099;

viii.  Award Plaintiff K.S. reasonable attorneys' fees and costs incurred in connection with this action; and

ix.  Award such other, and further, relief as to the Court may deem just and proper.

Dated:   July 15, 2024
         New York, NY

Respectfully submitted,

THE LAW OFFICE OF ELISA HYMAN, P.C.

By_____
Elisa Hyman
1115 Broadway, 12th Floor
New York, NY 10010
Phone: (646) 572-9064
Fax: 646-572-9055
elisahyman@gmail.com